**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| Well Thrive Ltd., a Samoa Corporation, | |
| Plaintiff, | |
| vs. | C.A. No. 1:17-cv-00794-MN |
| SemiLEDs Corporation, a Delaware Corporation, | |
| Defendant. | |

**SEMILEDS CORPORATION'S [PROPOSED] FINDINGS OF FACT**

As ordered by the Court, defendant SemiLEDs Corporation submits its proposed findings of fact after trial. References to Stipulated Facts are to the stipulated facts in the Pretrial Order. References to exhibits, either JTX or DTX, are to the exhibit and specific page number except when the exhibit consists of only one page. References to the testimony of witnesses is to the date and page of the transcript for that date. Where it is believed to be of assistance to the Court, the reference also includes a designation of the identity of the witness or witnesses whose testimony is referenced.

1.      Plaintiff Well Thrive is a Samoa corporation that is used as an investment vehicle by Mr. Chang Sheng-Chun ("Mr. Chang") (Stipulated Fact 1).

2.      Mr. Chang is a citizen and resident of Taiwan (Stipulated Fact 2). Mr. Chang's native language is Chinese and he does not speak or read in the English language (3/2 at 29). Mr. Chang operates a mid- to small-size family-owned bookstore in Taiwan and has operated Well Thrive to make investments for around 10 years (3/2 at 29-30). Mr. Chang has invested in companies in which Mr. Daniel Shih was involved since 1999 (3/2 at 32).

3.      Daniel Shih is the son of an old friend of Mr. Chang. (3/2 at 31).  Mr. Chang has known him since he was in grade school (3/2 at 31).  Mr. Chang speaks with him "all the time."  (3/2 at 56 (Chang)).  Mr. Shih refers to Mr. Chang as his "uncle."  (3/2 at 79-80).  Mr. Shih was involved with Aircom Pacific from about 2013 to January 2018 (3/2 at 78-79).  He is now employed by Dadny Aviation (3/2 at 77-79).

4.      Peter Chiou is currently self-employed by his own company that produces artificial intelligence processors (3/3 at 56).  Before that, he was one of the founders and was employed by Aircom Pacific (3/3 at 56-58).  The other founding members were Daniel Shih and, later, Jan Lin (3/3 at 58).  Mr. Chiou worked for Aircom Pacific from 2015 until the end of 2017 (3/3 at 58).  He was the Vice-President of Engineering and later was the Chief Executive Officer (3/3 at 58).  Mr Chiou resigned from his employment at Aircom Pacific because he was uncomfortable being asked to sign what he believed to be a fraudulent S-1 registration statement, because Aircom Pacific did not pay his salary, and because of strategic differences (3/3 at 58-64 and DTX-21).

5.      Mr. Chiou has known Mr. Shih since 2004 or 2005 (3/3 at 64).  In 2016, Mr. Chiou became aware that Mr. Shih had been convicted of securities fraud in Taiwan and had spent 55 days in jail (3/3 at 64-69).

6.      Mr. Chiou met Mr. Chang through Mr. Shih and met with him in person three or four times and had one electronic communication with him (3/3 at 69-70, 93-94, 106, 107 (Chiou)).  In their conversations, Mr. Chang told Mr. Shih in Mr. Chiou's presence to make decisions for him (3/3 at 94).

7.      Defendant SemiLEDs is a Delaware corporation with its principal place of business in Taiwan (Stipulated Fact 3).  SemiLEDs was incorporated in 2005 (3/2 at 193).  SemiLEDs manufactures and sells LED lighting products (3/2 at 192-193).  It sells its products around the

world.  (3/2 at 194).  SemiLEDs has approximately 135 employees in Taiwan and the United States. (3/2 at 194).  It owns approximately 200 patents (3/2 at 194).

8.      SemiLEDs is a public company whose stock trades on the NASDAQ exchange under the ticker "LEDS" (Stipulated Fact 4).  SemiLEDs went public on the NASDAQ exchange in 2010 (3/2 at 193).

9.      There is a lot of competition in the market for LED products and, after SemiLEDs went public in 2010, Chinese companies began dumping LED products at low prices, causing financial difficulties for SemiLEDs (3/2 at 194-195).

10.      Trung Doan is the Chairman and Chief Executive Officer of SemiLEDs, and has served in those positions since 2005 (Stipulated Fact 5).  Mr. Doan holds Bachelor of Science, with honors, and Master of Science degrees from the University of California at Santa Barbara, obtained in 1979 and 1981, respectively (3/2 at 190).  Prior to forming SemiLEDs, Mr. Doan worked at Intel Corporation, Honeywell, Phillips, and then Micron Technology, where he worked for fifteen years, and became the Vice-President of Process Development (3/2 at 190).  Following his work at Micron Technology from 1988-2003, Mr. Doan became the Chief Executive Officer of Jusung Engineering, a Korean company making equipment, for about 1 ½ years (3/2 at 191-192).  He then worked at Applied Materials for about a year as corporate Vice President in charge of global service products (3/2 at 192).  Mr. Doan has also served on several boards of directors, including both public and private companies (3/2 at 192).

11.      Christopher Lee is the Chief Financial Officer of SemiLEDs, and has served in that position since 2014 (Stipulated Fact 6).  Mr. Lee has a Bachelor's degree in accounting from Ohio State University, obtained in 1993, and a Master's degree in business taxation obtained from Golden Gate University in 2000 (3/2 at 115).  He is licensed as a Certified Public Accountant in California

(3/2 at 115).  Prior to joining SemiLEDs, Mr. Lee worked at a CPA firm and was self-employed for three years (3/2 at 115).

12.     In early 2016, Mr. Lee had discussions with Mr. Shih about the possibility that he might invest in SemiLEDs (3/3 at 73).  When Mr. Shih was in jail, in February 2016, he asked Mr. Chiou to take over the transaction (3/3 at 73).

13.     Between February and June 2016, Mr. Doan and Mr. Lee had discussions with Mr. Chiou, Mr. Shih, and Mr. Lin about a possible investment by them in SemiLEDs (3/2 at 195).  Mr. Doan had about 15 in-person meetings with Mr. Chiou, fewer than five meetings with Mr. Shih, and fewer than three meetings with Mr. Lin; these meetings took place in both Taiwan and the United States (3/2 at 196).  Mr. Doan also had telephone conferences with them (3/2 at 196).

14.     During the discussions that led to the execution of the Purchase Agreement, Mr. Doan told Mr. Shih and Mr. Chiou that SemiLEDs had lost millions of dollars in 2015 and 2016, had an accumulated deficit, and needed money.  (3/2 at 198-199 (Doan)).

15.     The parties ultimately agreed that Mr. Chiou would invest $4.5 million in SemiLEDs, divided into the purchase of shares of SemiLEDs stock up to 19.9% ownership for $2,885,000, a percentage designed to avoid triggering the need for shareholder approval, and the balance of $1,615,000 in the form of a convertible promissory note (3/2 at 197-198 (Doan); 3/3 at 99-100 (Chiou)).

16.     SemiLEDs communicated to Mr. Chiou that it wanted to receive the money for the promissory note as soon as possible but Mr. Chiou asked for three months to get the funds together (3/3 at 10-11).

17.     Outside counsel for SemiLEDs prepared a draft of the Purchase Agreement that Mr. Doan shared with Mr. Shih and Mr. Chiou (3/3 at 13-14).  That draft was received into evidence at

4

DTX-25.  Section 6.2.2 of that draft contained a liquidated damages provision in the amount of $3 million.  DTX-25, at 9.  Mr. Doan proposed that amount of liquidated damages to try to make sure that Mr. Chiou went through with the investment because SemiLEDs needed the funds that he was investing.  (3/3 at 11-12).

18.     During discussions about this draft provision, Mr. Chiou and Mr. Shih said that the $3 million figure was too high and asked that it be modified (3/3 at 14).  Mr. Doan then shared with them a revised draft of the Purchase Agreement, received into evidence as DTX-27 (3/3 at 14-15).  That draft removed the $3 million liquidated damages amount and replaced it specifying that SemiLEDs "shall keep all cash deposit made by the Investor as liquidated damages."  DTX-27, at 9.

19.     Mr. Doan then shared another draft of the Purchase Agreement with Mr. Shih and Mr. Chiou, received into evidence as DTX-26 (3/3 at 16).  That draft had the same liquidated damages provision found in DTX-27 (DTX-26 at 9).

20.     On June 28, 2016 SemiLEDs entered into the Purchase Agreement with Peter Chiou (Stipulated Fact 11; JTX-1).

21.     On August 4, 2016, Peter Chiou assigned all of his rights, title and interest in the Purchase Agreement to Well Thrive, pursuant to an Assignment and Assumption of Purchase Agreement that was executed by Mr. Chiou, Mr. Chang, and SemiLEDs' Chairman Trung Doan (Stipulated Fact 13; JTX-2; JTX-3).

22.     SemiLEDs consented to the assignment of the Purchase Agreement from Peter Chiou to Well Thrive (Stipulated Fact 14).

23.     The reason for the assignment and assumption was that Well Thrive, not Mr. Chiou, had begun to wire money to SemiLEDs for the purchase of the shares and Mr. Doan wanted the party paying for the shares to be the shareholder and the party to the Purchase Agreement (3/2 at

185; 3/3 at 19).  As a result, he asked for the assignment and assumption and asked for and received letters from individuals who had wired money identifying themselves as Well Thrive shareholders (DTX-2; DTX-3).  When he did not receive letters from two other persons who had wired money, he returned the funds to them (3/3 at 3-8).

24.     Before Well Thrive assumed the Purchase Agreement, Mr. Chang had had no personal communications with Mr. Doan, Mr. Lee, or any other representative of SemiLEDs (3/2 at 52-53 (Chang); 3/2 at 170, 196 (Doan)).

25.     During the discussions that led to the execution of the Purchase Agreement and the Assignment and Assumption Agreement, "every communication" Mr. Chang received concerning Well Thrive's investment came from Mr. Shih (3/2 at 35 (Chang)).  Mr. Chang received all of his information about the transaction from Mr. Shih (3/2 at 43 (Chang)).   All of Mr. Chang's information about the Purchase Agreement came from Mr. Shih (3/2 at 52-55 (Chang)).  Mr. Shih asked Mr. Chang to sign the Purchase Agreement (JTX-1) and the Assignment and Assumption of Purchase Agreement (JTX-2) (3/2 at 92-93 (Shih)).  Mr. Chang did not read these documents before he signed them, relying on Mr. Shih's explanations of their contents (3/2 at 53-54).  Mr. Shih testified, however: "we just sign by our understanding, but I'm not pretty sure what exactly inside all the things."  (3/2 at 93 (Shih)).

26.     The Purchase Agreement contemplated the purchase of two tranches of SemiLEDs securities – 577,000 shares of SemiLEDs common stock, and a convertible Promissory Note (Stipulated Fact 16; JTX-1, at §§ 1.1, 1.2).

27.     Well Thrive paid $2,885,000 to purchase the 577,000 shares of SemiLEDs common stock contemplated by the Purchase Agreement; the stock was delivered by SemiLEDs to Well Thrive.  Payment for and delivery of the common stock is not in dispute in this case (Stipulated Fact

17).  Well Thrive paid the first $1 million of the $2,885,000 before July 6, 2016 (JTX-14 at 3).  Well

Thrive paid the balance on or before August 15, 2016 (3/3 at 77 (Chiou)) and, on August 23, 2016,

after receiving the full $2,885,000, SemiLEDs issued the shares to Well Thrive (JTX-15 at 2; 3/2 at

181 and 3/3 at 8 (Doan)).

      28.     After it made the payment for the shares of common stock, Well Thrive, as a 19.9%

shareholder, was entitled to have a seat on the SemiLEDs board of directors (3/2 at 174-175; 3/3 at

8-9 (Doan)).  It was up to Well Thrive to nominate a director (3/2 at 122 (Lee)).  The parties initially

contemplated that Mr. Shih would be Well Thrive's designated representative and SemiLEDs sent

him a questionnaire to complete for this purpose.  (3/2 at 152; 3/3 at 156-157 (Lee)).  Mr. Shih's

answers to the questionnaire were inaccurate with respect to his education and dishonest by failing to

report his criminal conviction for securities fraud in Taiwan (3/3 at 76 (Chiou); 3/3 at 156-158

(Lee)).  As a result, he was not eligible to be Well Thrive's designated representative on the

SemiLEDs board (3/2 at 154; 3/3 at 9).

      29.     In mid-August 2016, Mr. Chang and Well Thrive appointed Peter Chiou as Well

Thrive's representative on SemiLEDs' Board of Directors, a position that he held until February

2017 (Stipulated Fact 15; JTX-4; DTX-2; DTX-3).  JTX-4 is a letter from Well Thrive, signed by

Mr. Chang, to the Board of Directors of SemiLEDs, dated August 13, 2016; the letter provides, in

pertinent part: "This letter is to appoint Dr. Peter Chiou to represent Well Thrive Limited to be

nominated to sit on SemiLEDS Corporation's Board of Directors."

      30.     The purchase price for the Promissory Note contemplated by the Purchase Agreement

was $1,615,000 (Stipulated Fact 18).  Mr. Chang knew that the Purchase Agreement required

payment of the $1,615,000 by September 29, 2016 (3/2 at 55 (Chang)).

      31.     Section 1.2 of the Purchase Agreement provides in full as follows:

Subject to the terms and conditions of this Agreement, the Investor agrees to purchase at the Note Closing (as defined below) and the Company agrees to sell and issue to the Investor a Note in the principal amount of $1,615,000.  The purchase price of the Note shall be equal to 100% of the principal of the Note.

(JTX-1, at 2).

32.     Section 1.3 of the Purchase Agreement provides in full as follows:

The date on which the closing of such purchase and sale of the Note occurs (the "***Note Closing***") is hereinafter referred to as the "***Note Closing Date***" and will be on or before September 29, 2016, the date that is ninety (90) days after the date of this Agreement.  The Note Closing will be deemed to occur at the offices of Orrick, Herrington & Sutcliffe, LLP, 405 Howard Street, San Francisco, California 94105, when (A) this Agreement and the Note have been executed and delivered by the Company and the Investor, (B) each of the conditions to the Note Closing described in <u>Section 5</u> of this Agreement has been satisfied or waived as specified therein and (C) full payment of the purchase price for the Note (the "***Note Purchase Price***") has been made by the Investor to the Company by wire transfer of immediately available funds against physical delivery by the Company of a duly executed Note in the name of the Investor as is set forth on the signature page hereto.

(JTX-1, at 2-3).

33.     Section 5.1 of the Purchase Agreement provides in full as follows:

The Investor's obligations to effect each Closing, including without limitation its obligation to purchase the Shares or Note, as applicable, at each Closing, are conditioned upon the fulfillment (or waiver by the Investor in its sole and absolute discretion) of each of the following events of each Closing Date:

5.1.1    the representations and warranties of the Company set forth in this Agreement shall be true and correct in all material respects as of each Closing Date as if made on such date (except that to the extent that any such representation or warranty relates to a particular date, such representation or warranty shall be true and correct in all material respects as of that particular date);

5.1.2    the Company shall have delivered to the Investor a certificate, signed by the Chief Executive Officer of the Company or the Chief Financial Officer of the Company and dated as of each Closing Date, certifying that the conditions specified in <u>Section 5.1.1</u> above have been fulfilled, it being understood that the Investor may rely on such certificate as though it were a representation and warranty of the Company made herein; and

5.1.3    the Company shall have delivered to the Investor a duly executed certificate representing the Shares, and the duly executed Note, as applicable, being

8

purchased by the Investor at each Closing."

(JTX-1, at 9).

34.     Section 5.2 of the Purchase Agreement provides in full as follows:

The Company's obligations to effect each Closing with the Investor are conditioned upon the fulfillment (or waiver by the Company in its sole and absolute discretion) of each of the following events of each Closing Date:

5.2.1   the representations and warranties of the Investor set forth in this Agreement shall be true and correct in all material respects as of each Closing Date as if made on such date (except that to the extent that any such representation or warranty relates to a particular date, such representation or warranty shall be true and correct in all material respects as of that date);

5.2.2   the Investor shall have tendered to the Company the Share Purchase Price or the Note Purchase Price, as applicable, for the Securities being purchased by it at each Closing by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth on **Exhibit B** hereto; and

5.2.3   on or before the Note Closing, the Investor shall have completed and delivered to the Company a validly executed IRS Form W-8 BEN or IRS Form W-9, as applicable, establishing the Investor's exemption from withholding tax."

(JTX-1, at 9).

35.     Section 6.2.1 of the Purchase Agreement provides in full as follows:

If (a) the Investor has completed its obligations under <u>Sections 5.2.1</u>, and <u>5.2.2</u>, and has tendered the Share Purchase Price and the Note Purchase Price as required in <u>Section 5.2.2</u>, and (b) the Company fails to complete the obligations set forth in <u>Section 5.1</u> or otherwise fails to consummate the transaction by December 31, 2016, then upon receipt of written request from the Investor, the Company shall promptly return to the Investor any cash deposit to the Company's bank account made by the Investor minus the Company's legal or investment banker costs.

(JTX-1, at 10).

36.     Section 6.2.2 of the Purchase Agreement provides in full as follows:

If (a) the Company has completed its obligations under Section 5.1.1 and 5.1.2 and has tendered the Securities as required in 5.1.3, and (b) the Investor fails to complete the obligations set forth in Section 5.2 or otherwise fails to consummate the transaction by December 31, 2016, then the Company shall keep all cash deposits made by the Investor as liquidated damages.

(JTX-1, at 10).

37.     Section 6.2.3 of the Purchase Agreement provides in full as follows:

"This Section 6.2 shall survive any termination or expiration of this Agreement."  (JTX-1, at 10).

38.     The form of the "Convertible Unsecured Promissory Note" was attached as Exhibit A to the Purchase Agreement (JTX-1, at 14-20; JTX-26).

39.     In August 2016, Well Thrive wired $500,000 to SemiLEDs as a deposit towards the purchase price of the Promissory Note (Stipulated Fact 19; JTX-5).  Mr. Doan discussed these funds with Mr. Shih and Mr. Chiou and they agreed that SemiLEDs could retain these funds as a deposit towards the $1,615,000 note purchase price and that SemiLEDs could retain these funds if Well Thrive did not complete the transaction (3/3 at 19-20 (Doan); 3/3 at 102 (Chiou)).

40.     SemiLEDs reported the Purchase Agreement in its SEC filings in 2016.  On or about July 6, 2016, SemiLEDs reported the Purchase Agreement in a Form 8-K for the period ending June 30, 2016 (JTX-14 at 3).  On or about August 23, 2016, SemiLEDs reported the Assignment and Assumption of Purchase Agreement in a Form 8-K/A (JTX-15, at 5).

41.     After SemiLEDs reported the Purchase Agreement in its Form 8-K on or about July 6, 2016, the reported stock price of SemiLEDs increased. (JTX-19, at 4).

42.     Well Thrive did not make any subsequent payments or deposits towards the purchase price for the Promissory Note (Stipulated Fact 19).

43.     Mr. Doan understood and expected that the closing of the note purchase would involve a simultaneous exchange of the required documents and funds handled through the Orrick law firm (3/3 at 22-24).

44.     Before September 29, 2016, Mr. Doan executed the promissory note on behalf of Well Thrive. (DTX-28; 3/3 at 21 (Doan)).  Before September 29, 2016, Mr. Doan forwarded the

executed promissory note to the Orrick firm (3/3 at 22 (Doan)).  Mr. Doan told Mr. Chiou that he

had sent the executed note to Orrick (3/3 at 53 (Doan)).  Mr. Doan had already provided the Orrick

firm with a certificate certifying that the representations and warranties set forth in the Agreement

were true and correct (3/3 at 23).

45.     Well Thrive did not pay the balance of the $1,615,000 by September 29, 2016 (3/2 at

55 (Chang); 3/2 at 150 (Lee); 3/3 at 21 (Doan)).

46.     By September 29, 2016, Well Thrive did not provide SemiLEDs with a validly

executed IRS Form W-8 BEN or IRS Form W-9 (3/3 at 24).

47.     After Well Thrive did not pay the balance of the price of the promissory note by

September 29, 2016, Mr. Doan verbally asked Mr. Chiou for the rest of the money (3/2 at 173-175)

but Well Thrive did not pay the balance of the price of the note.

48.     After Well Thrive did not pay the balance of the price of the promissory note on

September 29, 2016, the reported stock price of SemiLEDs declined (JTX-19, at 1-3).

49.     SemiLEDs' SEC filings disclosed the potential financial consequences to it if Well

Thrive did not complete the purchase of the promissory note specified in the Purchase Agreement.

On or about November 21, 2016, SemiLEDs submitted a Form 10-K for the fiscal year ending

August 31, 2016 (JTX-16; 3/2 at 142 (Lee).  The financial statements included within this filing

showed that SemiLEDs had suffered a net loss in 2015 of $13,318,000 and a net loss in 2016 of

$21,304,000 (JTX-16, at 114).  This SEC filing stated: "**If we are unable to complete the sale of a**

**note for $1.6 million or, if completed, we are unable to get shareholder approval to permit the**

**conversion of the Note, we may not be able to continue as a going concern.**" (JTX-16, at 20

(emphasis in original).  The SEC filing continued: "The failure to complete the sale or get

11

shareholder approval would impact the viability of our liquidity plan and our ability to continue as a going concern." (JTX-16, at 22).

50.     The reference to SemiLEDs' possible inability to continue as a going concern meant that, without the $1.6 million, SemiLEDs might run out of money within a year (3/2 at 143 (Lee)).

51.     Well Thrive decided not to complete its purchase of the Promissory Note (Stipulated Fact 20).  The decision was made by Mr. Shih, Mr. Chiou, and Jan Lin. (3/3 at 80-81 (Chiou ).  One reason Well Thrive decided not to complete the purchase of the Promissory Note was a FINRA inquiry into fluctuations in SemiLEDs' stock price.  (Complaint (D.I. 1), ¶¶ 7, 10 ; 3/3 at 155 (Lee)). Another reason Well Thrive decided not to complete the purchase was its belief that SemiLEDs had failed to properly disclose information about its financial affairs (Complaint (D.I. 1), ¶¶ 8, 10).

52.     Well Thrive requested SemiLEDs to return Well Thrive's $500,000 deposit towards the purchase price of the Promissory Note (Stipulated Fact 20).

53.     SemiLEDs did not return Well Thrive's $500,000 deposit towards the purchase price of the Promissory Note (Stipulated Fact 21).

54.     During the same time period that the parties were discussing the Purchase Agreement, the parties had also discussed the possibility of a merger between SemiLEDs and Aircom Pacific (3/2 at 116-118).  On or about May 23, 2016, Mr. Lee sent an offer letter to Mr. Chiou and Mr. Shih (JTX-8) but the parties did not sign the offer letter (3/2 at 118, 147).  On July 26, 2016, Mr. Doan sent Mr. Lin, the President of Aircom Pacific, a letter of intent, which Mr. Lin signed on the following day (JTX-9).  By its own terms, the letter of intent was nonbinding (JTX-9, at 3). Following the execution of the letter of intent, SemiLEDs conducted due diligence concerning the potential merger, including the engagement of an outside CPA firm and attorneys (3/2 at 130-131(Lee).  On December 16, 2016, the SemiLEDs board of directors voted not to proceed with the

possible merger (3/2 at 132 (Lee)).  The board voted against the possible merger because its due diligence review revealed Mr. Shih's criminal conviction and because Well Thrive had not paid the balance of the price of the note (3/2 at 169-170; 3/3 at 26 (Doan)).

55.    The Purchase Agreement (JTX-1) makes no reference to the possible merger (JTX-1; 3/3 at 17 (Doan)).  The convertible promissory note does not make any reference to the possible merger (JTX-26 and DTX-28; 3/3 at 17 (Doan)).  The letter of intent for the possible merger makes no reference to the Purchase Agreement or the convertible promissory note (JTX-9; 3/3 at 18 (Doan)).  The two transactions were separate from each other (3/2 at 148-149 (Lee; 3/3 at 47 (Doan)).

56.    Mr. Doan did not tell Mr. Shih that a SemiLEDs shareholders meeting would take place in September or October 2016 to vote on the proposed merger (3/3 at 29).  The SemiLEDs annual shareholders meeting for 2016 had already taken place before the execution of the Purchase Agreement and the 2017 shareholders meeting was scheduled for and took place in the spring of 2017 (3/3 at 29-30).  Mr. Doan never told Mr. Shih that he would return the $500,000 in dispute in this case (3/3 at 31).

57.    On December 16, 2016, SemiLEDs sent a letter to Mr. Chang and Mr. Chiou demanding payment of $1,115,000, the unpaid balance of the Note Purchase Price of $1,615,000 (JTX-10).  The letter also specified that, if SemiLEDs did not receive those funds by December 31, 2016, it would retain the $500,000 deposit as liquidated damages pursuant to section 6.2.2 of the Purchase Agreement (JTX-10).

58.    On or about December 27, 2016, SemiLEDs submitted a Form 10-K/A for the fiscal year ending August 31, 2016 (JTX-17).  It amended only certain items from the 10-K filed on

November 21, 2016 (JTX-16) and did not amend the sections of the 10-K quoted in paragraph 49 above (JTX-17, at 3).

59.     On or about January 13, 2017, SemiLEDs submitted a Form 10-Q for the quarterly period ending November 30, 2016 (JTX-18; 3/3 at 153 (Lee)).  The 10-Q form described SemiLEDs' significant financial losses during 2015 and 2016 (JTX-18, at 43).

60.     Well Thrive's non-payment of the $1,115,000 amount specified in the Purchase Agreement caused SemiLEDs financial harm.  In addition to the decline in its stock price, because it needed cash immediately, SemiLEDs sold machinery and other equipment far below its fair market value, in distress sales, and had to borrow additional funds to operate and pay interest on those borrowings.  (3/3 at 27-29 (Doan)).  The financial harm to SemiLEDs due to Well Thrive's failure to complete the transaction cost exceeded $500,000 (3/3 at 29 (Doan)).

61.     Upon receipt of SemiLEDs demand letter (JTX-10)  Mr. Chang and Mr. Shih discussed it together in person.  (3/2 at 96-98 (Shih)).  They used a lot of "F words" in Taiwanese in the discussion and called the people at SemiLEDs "those mother f….s."  (3/2 at 97-98 (Shih)).  Mr. Shih's response was "I'll sue them right away" and he immediately called Mr. Lin, a lawyer, to say that Well Thrive needs to "sue them right away."  (3/2 at 98 (Shih)).

62.     After Well Thrive decided to sue SemiLEDs, Mr. Shih, Mr. Chiou, and Mr. Lin discussed the engagement of counsel (3/3 at 83).  Mr. Chiou contacted three lawyers recommended by Mr. Lin but Christopher Prince, of Lesnick, Prince & Pappas, was the only lawyer willing to take the case (3/3 at 83-84).  Mr. Shih decided on behalf of Mr. Chang to hire the Lesnick, Prince & Pappas law firm in Los Angeles (3/2 at 99-100 (Shih)).

63.     Christopher Prince, Esq., a partner of the firm, was the primary lawyer for Well Thrive.  He received two undergraduate degrees from the University of Illinois in 1992 and his law

degree from UCLA Law School in 1995 (3/3 at 113-114). He became a member in good standing of the California Bar after his law school graduation and has been a member in good standing ever since (3/3 at 115-116). He has been admitted to practice before various federal courts (3/3 at 115-116).

64.     Mr. Shih only spoke with the lawyers once and did not receive any emails or documents from them. (3/2 at 100-101, 104 (Shih)). When he spoke with Mr. Prince, Mr. Shih told him that Mr. Chiou would be the "major contact window" to tell him the story behind the dispute (3/2 at 101 (Shih).

65.     Mr. Shih told Mr. Chiou that his "mission" was to get the money back from SemiLEDs (3/2 at 102 (Shih)). Mr. Shih represented the interests of Well Thrive and Mr. Chang in this case (3/2 at 105 (Shih)). Mr. Chang agreed to have Mr. Chiou act as his liaison in this case upon the recommendation of Mr. Shih (3/2 at 71-72). Mr. Shih asked Mr.Chiou to "handle this case" for Well Thrive (3/3 at 84, 87 (Chiou)). This meant that Mr. Chiou was to handle all the communications with the attorneys, explain everything to them, and to handle "basically anything involving this case." (3/3 at 87).

66.     After Well Thrive engaged Lesnick, Prince & Pappas, Mr. Chiou provided Mr. Prince with all of the background information about the case (3/3 at 85-86).

67.     On January 6, 2017, Well Thrive responded to SemiLEDs' December 16, 2016 demand letter by a letter from Lesnick, Prince & Pappas LLP to Mr. Doan of SemiLEDs (JTX-11). The letter refused to pay the balance of the Note Purchase Price and demanded the return of the $500,000 deposit. *Id.* The letter argued that the retention of the $500,000 by SemiLEDs would be an unenforceable penalty but did not argue that SemiLEDs had failed to satisfy a condition precedent to its retention of the funds. *Id.*

68.     Well Thrive filed this action on June 21, 2017, represented by Mr. Prince's law firm and local Delaware counsel (D.I. 1).  This Court admitted Mr. Prince *pro hac vice* in this case.  (3/3 at 116).

69.     SemiLEDs filed an answer on August 11, 2017, represented by Dan Woods, Esq. of Musick Peeler & Garrett and local Delaware counsel (D.I. 9).  With the Court's permission, SemiLEDs later filed an amended answer on December 10, 2019 (D.I. 60).

70.     After SemiLEDs filed its original answer, counsel for the parties conducted a Rule 26 conference (3/3 at 118).

71.     On September 19, 2017, counsel for Well Thrive forwarded a draft joint status report to counsel for SemiLEDs (DTX-5; 3/3 at 119 (Prince)).  Paragraph 11 of the draft joint status report stated: "The parties have discussed settlement and settlement discussions are ongoing."  (DTX-5, at 5).  Mr. Prince testified that this discussion included the notion that this "seemed like a good case for settling."  (3/3 at 120).

72.     On September 20, 2017, the parties filed a joint status report with this Court (JTX-21).  Paragraph 11 of the joint status report stated:  "The parties have discussed settlement and settlement discussions are ongoing."  (JTX-21, at 3).

73.     On October 24, 2017, this Court issued an order scheduling a telephone conference on December 5, 2017, before Magistrate Judge Mary Pat Thynge to discuss ADR (D.I. 15; DTX-6; 3/3 at 122 (Prince)).

74.     As the case progressed, Well Thrive started to receive bills for legal services from its California and Delaware lawyers.  (3/2 at 109-110 (Shih); 3/3 at 88 (Chiou)).  Mr. Shih was "bitching and yelling" about the first bill but it was paid (3/3 at 89-90).  After receiving the second round of bills, Mr. Shih became "really, really, really, really angry" and told Mr. Chiou that the

lawyers were "excessively charging" them (3/3 at 90).  Mr. Shih asked Mr. Chiou to find out when Well Thrive could get its money back (3/3 at 89).  Mr. Chiou spoke with Mr. Prince and Mr. Prince told him that he did not believe Well Thrive could recover all of the $500,000 (3/3 at 89-90 (Chiou)). At Mr. Shih's request, Mr. Chiou asked Mr. Prince for the most likely result and Mr. Prince estimated that Well Thrive might recover $100,000 to $200,000 (3/3 at 91 (Chiou).  Mr. Chiou communicated this information to Mr. Shih (3/3 at 91).  At that point, Mr. Shih told Mr. Chiou that the case was a "waste of money" because the fees might exceed the amount recovered (3/3 at 94-95 (Chiou)).

75.     Mr. Shih also asked Mr. Chiou to speak with SemiLEDs to see if it would settle (3/2 at 108-109).  Mr. Chiou asked Mr. Lee about settling the case but Mr. Lee informed him that SemiLEDs would not pay any money to settle the case.  (3/3 at 109).

76.     Mr. Chiou reported this information to Mr. Shih and, after "yelling and bitching a lot," Mr. Shih told Mr. Chiou "to go settle it."  (3/3 at 92 (Chiou).  Mr. Chiou contacted Mr. Prince and they decided to settle the case on terms that involved each party walking away and paying its own fees and costs to "stop the bleeding" of attorneys' fees (3/3 at 92, 110).  Mr. Chiou discussed settlement on those terms with Mr. Shih and Mr. Shih "sighed" and said "go for it."  (3/3 at 92-93). Mr. Chiou then told Mr. Prince to settle the case on those terms (3/3 at 92-93 (Chiou)). When he did so, Mr. Chiou believed that he had authority from Mr. Shih to agree to settle on those terms for Well Thrive (3/3 at 110-111).

77.     On November 27, 2017, counsel for Well Thrive wrote an email to counsel for SemiLEDs, stating: "Our ADR conference is coming up next week…Have you had the opportunity to speak with your client about settlement along the lines we discussed?" (DTX-7).  This referenced a discussion between Mr. Prince and Mr. Woods in which they discussed the costs of litigation and

the need for foreign depositions (3/3 at 124-125 (Prince)).  Mr. Prince suggested that the case could be settled for less than the $500,000 sought by the complaint and may have mentioned the figure of $100,000 as a possible settlement amount.  (3/3 at 124-125 (Prince)).

78.     On November 29, 2017, counsel for Well Thrive wrote an email to counsel for Well Thrive, stating: "I understand from my client that the parties have reached some accommodation…I am told that the parties have agreed to a dismissal with each side to bear its own costs. Can you confirm with your client?"  (DTX-8, at 1; 3/3 at 125 (Prince)).  The email also stated: "I have prepared a stipulation for dismissal.  Let me know if the form is acceptable" and attached a proposed stipulation for dismissal.  The proposed stipulation for dismissal provided as follows: "IT IS HEREBY STIPULATED by and between Plaintiff Well Thrive Ltd. and Defendant SemiLEDs Corporation, through their undersigned counsel and subject to approval by the Court, as follows: The complaint on file in this action be dismissed, without prejudice, in its entirety pursuant to Federal Rule of Civil Procedure 41(a)(1), with each party to bear its own attorneys' fees and costs."  (DTX-8, at 2; 3/3 at 128-129 (Prince)).

79.     On November 30, 2017, counsel for SemiLEDs responded to the November 29 email and confirmed that the parties had agreed to a dismissal with each party to bear its own costs and attorneys' fees but proposed that the stipulation for dismissal be with prejudice, not without prejudice (DTX-9, at 2).  Counsel for Well Thrive responded the same day in an email stating: "I don't have a problem revising the stipulation, but if the suit is dismissed with prejudice, we do need a formal agreement with mutual releases.  I'm happy to let you take a crack at the first draft."  (DTX-9, at 1-2).  Counsel for SemiLEDs responded later that day in an email to counsel for Well Thrive stating: "OK. Please revise the stipulation and we will prepare a draft settlement agreement with mutual releases."  (DTX-9, at 1; 3/3 at 129-131 (Prince)).

80.     On December 1, 2017, Delaware counsel for Well Thrive forwarded to counsel for both parties a draft letter to Magistrate Judge Thynge to inform her of the parties' settlement (DTX-11, at 1).  On the same day, counsel for SemiLEDs proposed a change in the draft letter to say that the parties have reached a settlement, deleting proposed language that said "in principle," that the parties are in the process of preparing a formal settlement agreement and a stipulation for dismissal, and expect to complete the settlement within two weeks (DTX-11, at 1).

81.     On the same day, December 1, 2017, Delaware counsel for Well Thrive circulated a revised version of the letter to Magistrate Judge Thynge and all counsel approved the letter (DTX-13, at 1-2).

82.     On December 1, 2017, Delaware counsel for Well Thrive filed the letter to Magistrate Judge Thynge (D.I. 23-1, Ex. K (originally docketed as D.I. 18 and removed by the Court per correcting entry of December 4, 2017)).  The letter stated: "I am pleased to report that the parties have reached a settlement of the case." (D.I. 23-1, Ex. K; 3/3 at 136 (Prince)).  After receiving the letter, Magistrate Judge Thynge took the telephone conference to discuss ADR off the calendar (D.I. 18).

83.     On December 4, 2017, counsel for SemiLEDs forwarded a draft settlement agreement to counsel for Well Thrive (DTX-14).  The draft settlement agreement provided for a dismissal of the action with prejudice, with each party to bear its own costs and attorneys' fees, and mutual releases (DTX-14, at 2-3). In response, counsel for Well Thrive said he would try to get comments to counsel for SemiLEDs by the next day (DTX-15).  At the time, counsel for both parties were working off the premise of a dismissal with prejudice and each party bearing its own attorneys' fees and costs (3/3 at 137 (Prince)).

84.    On December 19, 2017, counsel for Well Thrive sent an email to counsel for SemiLEDs with what he described as a "few minor revisions" to the draft settlement agreement prepared by counsel for SemiLED (DTX-16, at 1).

85.    On the same day, December 19, 2017, counsel for SemiLEDs wrote to counsel for Well Thrive that he agreed with all of his suggested changes, except the proposed deletion of "with prejudice" in one place (DTX-17, at 1). Counsel for the parties then exchange follow-up emails and counsel for Well Thrive said "OK." (DTX-17, at 1; 3/3 at 141-142 (Prince)). Mr. Prince signed off on drafts of the settlement documents including dismissal of the action with prejudice and waivers of fees and costs to be sent to clients for signature (3/3 at 139). One of the lawyers for Well Thrive communicated to counsel for SemiLEDs that there was a settlement (3/3 at 140-141 (Prince)).

86.    On December 21, 2017, counsel for Well Thrive forwarded a proposed stipulation for dismissal of the action with prejudice to counsel for SemiLEDs (DTX-18, at 1; 3/3 at 142-143 (Prince)). The proposed stipulation recited: "IT IS HEREBY STIPULATED by and between Plaintiff Well Thrive Ltd. and Defendant SemiLEDs Corporation, through their respective counsel, that this action be dismissed with prejudice with each party to bear its own attorneys' fees and costs." (DTX-18, at 2).

87.    On the same day, December 21, 2017, counsel for SemiLEDs forwarded a few minor comments on the proposed stipulation to counsel for Well Thrive (DTX-19, at 1-2). On December 26, 2017, counsel for Well Thrive responded by stating: "The changes are fine with me." (DTX-19, at 1). There was no disagreement between counsel regarding the form of the dismissal with prejudice (3/3 at 143 (Prince)). On December 27, 2017, counsel for SemiLEDs wrote to counsel for Well Thrive: "So we are all good. Our client has signed [the settlement agreement]. Please obtain your client's signature and let's wrap this up this week." (DTX-19, at 1).

88.     On February 26, 2018, Lesnick, Prince & Pappas and Delaware counsel for Well Thrive jointly moved to withdraw as counsel of record for Well Thrive (D.I. 19). The motion and its supporting declarations cited a breakdown in communications, irreconcilable differences, a conflict of interest, and non-payment of fees as the reasons for the motion to withdraw (D.I.. 19 at 2; D.I. 19-1, at ¶ 2; D.I. 19-2, at ¶ 2). On March 26, 2018, this Court granted the motions to withdraw (D.I. 26).

89.     On March 13, 2018, SemiLEDs filed a motion to enforce the settlement agreement that the parties had reached (D.I. 21).

90.     On March 27, 2018, Well Thrive, through new counsel of record, opposed the motion to enforce the settlement agreement (D.I. 27). Its opposition included a declaration from Mr. Chang executed on March 22, 2018, in both English and Chinese (D.I. 27-1; DTX-1). He signed both versions of the declaration and initialed each page of both the English and Chinese versions (3/2 at 60). When he signed the declaration, Mr. Chang had read the Chinese version of the declaration and Mr. Shih had explained the English language version to him (3/2 at 61). When he signed the declaration, he understood that he was signing it under penalty of perjury and that he was swearing to tell the truth (3/2 at 62-63). The English language version of the declaration states: "I have personal knowledge of the facts set forth below." (DTX-1 at 1). The Chinese language version of the declaration states: "I know of the following listed facts" and Mr. Chang testified that all of the facts in the declaration were true to the best of his knowledge (3/2 at 75).

91.     Mr. Chang's declaration is false in the following respects:

92.     In paragraph 6, Mr. Chang testified, under penalty of perjury: "I was not even aware that potential settlement was being discussed by the lawyers for the parties until January 2, 2018, at which point I immediately directed Well Thrive's former lawyers…to halt any settlement discussions." (DTX-1, at 2). Mr. Chang did not personally direct or communicate with the former

21

lawyers; he authorized Mr. Shih to do that (3/2 at 69-70).  At trial, he admitted that right around New Years Day of 2018, he was not aware of any communications between Mr. Chiou and Well Thrive's former lawyers about a potential settlement of the case. (3/2 at 48-49).

93.     In paragraph 12, Mr. Chang testified, under penalty of perjury, as follows: "As of December 31, 2017, Peter Chiou was terminated as the CEO of Aerkomm due to performance and other issues." (DTX-1 at 3).  At trial, Mr. Chang admitted that he had no personal knowledge of this statement and based it only on what Mr. Shih told him (3/2 at 65-67).  Mr. Chiou, however, had resigned from his position at Aircom Pacific voluntarily due to his discomfort at being asked to sign an S-1 form that he believed was inaccurate, Aircom's failure to pay his compensation, and strategic differences (3/3 at 58-59 (Chiou)).

94.     In paragraph 13, Mr. Chang testified, under penalty of perjury, as follows: "On January 2, 2018, Peter Chiou's e-mail boxes were examined by Aerkomm personnel.  At that time, several e-mails were discovered which indicated that Peter Chiou had communicated with Well Thrive's former lawyers regarding a potential settlement and dismissal of this case." (DTX-1, at 3). At trial, Mr. Chang admitted that he had no personal knowledge of these statements, that all of his information about these statements came from Mr. Shih, and that he did not see the referenced emails (3/2 at 68).  Mr. Shih also admitted that he had never seen the emails referenced in paragraph 13 of Mr. Chang's declaration (3/2 at 107 (Shih)).

95.     In paragraph 15, Mr. Chang testified, under penalty of perjury, as follows: "Upon learning this news, I immediately caused an email to be sent to Well Thrive's former counsel on January 2, 2018 instructing them not to consent to any settlement with Defendant." (DTX-1, at 3). At trial, Mr. Chang admitted that he did not personally send any email to Well Thrive's former counsel, asked Mr. Shih to do that, never saw any email Mr. Shih may have sent, and assumed that

he had sent the email (3/2 at 70-71).  He also admitted at trial that, right around New Years Day

2018, he was not made aware of any communications between Mr. Chiou and Well Thrive's former

lawyers about a potential settlement (3/2 at 48-49).

96.    SemiLEDs impeached the credibility of Well Thrive witness Daniel Shih, who

testified by deposition, by presenting evidence of his criminal conviction in Taiwan (3/3 at 9, 26, 64-

69) and evidence that he made false statements in a director's questionnaire (3/2 at 76; 3/3 at 156-

158).  Mr. Shih also did not recall several of the facts relevant to this case (3/2 at 81, 83, 87, 95).

97.    The following portions of the testimony of Daniel Shih were not credible: his

testimony that Mr. Doan agreed to wire the $500,000 back to Well Thrive (3/2 at 94-95) because Mr.

Doan credibly denied saying this to Mr. Shih (3/3 at 30-31); his testimony that SemiLEDs would

have a shareholders' meeting to approve the merger in the first or second week of September 2016

(3/2 at 85) because both Mr. Doan and Mr. Lee testified that the 2016 shareholders' meeting had

already taken place and the next shareholders' meeting was not scheduled until the spring of 2017

(3/2 at 149-150; 3/3 at 29-30).

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ Henry E. Gallagher, Jr.
</div>

OF COUNSEL:

Dan Woods
Musick, Peeler & Garrett LLP
624 S. Grand Ave., Suite 2000
Los Angeles, CA 90017
(213) 629-7622
d.woods@musickpeeler.com

DATED:  April 30, 2020

Henry E. Gallagher, Jr. (#495)
Lauren P. DeLuca (#6024)
CONNOLLY GALLAGHER LLP
1201 North Market Street, 20th Floor
Wilmington, DE 19801
(302) 757-7300
hgallagher@connollygallagher.com
ldeluca@connollygallagher.com

*Attorneys for Defendant SemiLEDs Corporation*