IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WELL THRIVE LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 17-794 (MN) |
| | ) | |
| SEMILEDS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## CORRECTED MEMORANDUM OPINION[*]

David S. Eagle, Sean M. Brennecke, KLEHR HARRISON HARVEY BRANZBURG LLP, Wilmington, DE; Robert D. Weber, SHEPPARD, MULLIN, RICHTER & HAMPTON LLP, Los Angeles, CA – Attorneys for Plaintiff

Henry E. Gallagher, Jr., Lauren P. DeLuca, CONNOLLY GALLAGHER LLP, Wilmington, DE; Dan Woods, MUSICK, PEELER & GARRETT LLP, Los Angeles, CA – Attorneys for Defendant

December 21, 2020
Wilmington, Delaware

[*]   This Corrected Memorandum Opinion deletes footnote 8 of the original Memorandum Opinion because subsequent submissions have shown that footnote to have been in error.

**NOREIKA, U.S. DISTRICT JUDGE:**

This case arises from a dispute between Plaintiff Well Thrive Ltd ("Well Thrive") and Defendant SemiLEDs Corporation ("SemiLEDs") over a $500,000 deposit paid in connection with a securities purchase agreement ("the Purchase Agreement"). The Court presided over a two-day bench trial on March 2 and 3, 2020. (D.I. 71 (3/2 Tr.); D.I. 72 (3/3 Tr.)). After trial, the parties submitted proposed findings of fact and post-trial briefs. (*See* D.I. 75, 76, 77, 78, 79 & 80). This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I.     BACKGROUND

Well Thrive is the assignee of the Purchase Agreement to buy securities from SemiLEDs. Well Thrive paid SemiLEDs a $500,000 deposit toward the purchase of a $1,615,000 convertible promissory note ("the Note"). Ultimately, Well Thrive did not pay the remaining $1,115,000 due on the Note and demanded a return of its $500,000 deposit. SemiLEDs refused to return the $500,000 deposit, asserting that it could be retained as liquidated damages.

Well Thrive filed its Complaint on June 21, 2017, asserting claims for declaratory judgment and unjust enrichment in connection with SemiLEDs retention of the $500,000 deposit. SemiLEDs filed its Answer on August 11, 2017. (D.I. 9). SemiLEDs filed its Amended Answer on December 10, 2019. (D.I. 60).

## II.     FINDINGS OF FACT

This section contains the Court's findings of fact on disputes raised by the parties during trial, as well as uncontested facts to which the parties have stipulated. Certain findings of fact are also provided in connection with the Court's discussion of its conclusions of law. (*See infra* § IV).

**A.      The Parties**

1.      Well Thrive is a Samoa corporation that is used as an investment vehicle by Chang Sheng-Chun ("Mr. Chang").[1]  (D.I. 62, Stipulated Fact No. 1).  Well Thrive has no employees and its only director throughout its existence has been Mr. Chang.  (D.I. 71 (3/2 Tr.) at 30).

2.      SemiLEDs is a Delaware corporation with its principal place of business in Taiwan. (D.I. 62, Stipulated Fact No. 3).  SemiLEDs manufactures LED lighting products, which it sells throughout the world.  (D.I. 71 (3/2 Tr.) at 192-194).

**B.      Fact Witnesses at Trial**

3.      Mr. Chang testified at trial.  Mr. Chang is a citizen and resident of Taiwan.  (D.I. 62, Stipulated Fact No. 2).  Mr. Chang speaks "a little" English, but cannot fully read English.  (D.I. 71 (3/2 Tr.) at 29).  Mr. Chang has operated Well Thrive as an investment vehicle for approximately ten years.  (*Id.* at 30).

4.      Daniel Shih testified by deposition.  Mr. Shih is the son of Mr. Chang's longtime friend.  On occasion, Mr. Shih advises Mr. Chang about investments.  (D.I. 71 (3/2 Tr.) at 31).

5.      Christopher Lee testified at trial.  Mr. Lee is the Chief Financial Officer of SemiLEDs, and has served in that position since 2014.  (D.I. 62, Stipulated Fact No. 6).

6.      Trung Doan testified at trial.  Mr. Doan is the Chairman and Chief Executive Officer of SemiLEDs, and has served in those positions since 2005.  (D.I. 62, Stipulated Fact No. 5; D.I. 71 (3/2 Tr.) at 160-161).

7.      Peter Chiou testified by deposition.  In 2014, Mr. Chiou co-founded a company called Aircom Pacific with Jan Lin and Mr. Shih.  (D.I. 72 (3/3 Tr.) at 58).

---

[1]      Mr. Chang is referred to as Mr. Chun in the transcript.

8.     Christopher Prince testified by deposition.  Mr. Prince is a partner at Lesnick Prince & Pappas.  Mr. Prince filed this case on behalf of Well Thrive.  (D.I. 1; D.I. 72 (3/3 Tr.) at 116-118).  He represented Well Thrive in this matter until he withdrew as counsel in March of 2018.  (*See* D.I. 26).

### C.     The Proposed Merger

9.     Mr. Chang, through Well Thrive, invested in Aircom Pacific when it was founded in 2014, and he remains an investor today.  (D.I. 71 (3/2/ Tr.) at 33-34; D.I. 62, Stipulated Fact No. 7).

10.     In 2016, Aircom Pacific desired to become a public company in the United States by acquiring and merging into a publicly-listed company.  (D.I. 62, p. 4, Stipulated Fact No. 8).

11.     SemiLEDs was identified as a potential target for a merger with Aircom Pacific.  (D.I. 62, Stipulated Fact No. 9).

12.     Mr. Chiou and Mr. Shih spoke with SemiLEDs' CFO, Mr. Lee, about a merger between Aircom Pacific and SemiLEDs.  (D.I. 71 (3/2 Tr.) at 115-117, 121).

13.     In May of 2016, Mr. Lee sent an offer letter to Mr. Chiou and Mr. Shih.  (JTX 8).  The letter set forth terms for a proposed merger of SemiLEDs into Aircom Pacific, including the following:  (a) SemiLEDs would sell 577,000 shares of its stock at $5.00 per share, totaling $2,885,000, to be paid in two installments; and (b) SemiLEDs would subsequently borrow $1,615,000, evidenced by a 0% convertible promissory note.  (*Id.*).  That letter was not signed.

14.     Thereafter, in July of 2016, Mr. Doan sent Mr. Lin (of Aircom Pacific) a letter of intent for the merger, which Mr. Lin signed.  (JTX 9; D.I. 62, Stipulated Fact No. 10).  The letter of intent was nonbinding.  (JTX 9 at 3).

3

     **D.**    **The Purchase Agreement**

15.    During discussions about the merger, in June of 2016, SemiLEDs and Aircom Pacific signed a separate document – the Purchase Agreement.  (JTX 1).  Mr. Chiou signed the Purchase Agreement on behalf of Aircom Pacific.  (*Id.*).

16.    On August 4, 2016, Mr. Chiou assigned all of his rights, title and interest in the Purchase Agreement to Well Thrive, pursuant to an Assignment and Assumption of Purchase Agreement that was executed by Mr. Chiou, Mr. Chang and SemiLEDs' Chairman, Mr. Doan. (JTX 2; D.I. 62, Stipulated Fact No. 13).[2]  SemiLEDs consented to the assignment of the Purchase Agreement from Mr. Chiou to Well Thrive.  (D.I. 62, Stipulated Fact No. 14).

17.    The Purchase Agreement contemplated the purchase of 577,000 shares of SemiLEDs common stock, in two installments, at a total price of $2,885,000. (JTX 1; D.I. 62, Stipulated Fact No. 16).  These terms were the same as those in the May 2016 offer letter from SemiLEDs about the proposed merger.  (*See* JTX 8; D.I. 71 (3/2 Tr.) at 128-130).

18.    Well Thrive paid $2,885,000 to purchase the 577,000 of SemiLEDs common stock by August 15, 2016 and the stock was delivered by SemiLEDs to Well Thrive.  Payment for and delivery of the common stock is not in dispute in this case.  (D.I. 62, Stipulated Fact No. 17; D.I. 71 (3/2 Tr.) at 139, 181).

19.    Additionally, under the terms of the Purchase Agreement, Well Thrive agreed to loan SemiLEDs $1,615,000, interest free.  Specifically, Well Thrive agreed to purchase at the Note Closing (defined below) and SemiLEDs agreed to sell and issue to Well Thrive the Note in the

---

[2]    Mr. Chang received information about the assignment and the Purchase Agreement from Mr. Shih.  (D.I. 71 (3/2 Tr.) at 43, 52-55).  Mr. Shih asked Mr. Chang to sign the Purchase Agreement (JTX 1) and the Assignment and Assumption of Purchase Agreement (JTX 2). (D.I. 71 (3/2 Tr.) at 92-93).  Mr. Chang did not read these documents before he signed them, and he relied on Mr. Shih's explanations of their contents.  (*Id.* at 53-54).

amount of $1,615,000. (JTX 1 at § 1.2, Ex. A; D.I. 71 (3/2 Tr.) at 40, 134). These terms were also the same as those in the May 2016 offer letter from SemiLEDs. (*See* JTX 8; D.I. 71 (3/2 Tr.) at 128-129).

20. The amount payable on the Note would be due "on the earlier of (i) September 29, 2017 and (ii) the occurrence of an Event of Default." (JTX 1 at Ex. A).

21. Pursuant to the terms of the Purchase Agreement, SemiLEDs could repay the loan either in cash or an equivalent amount of the company's stock. (D.I. 71 (3/2 Tr.) at 135).

22. In August 2016, Well Thrive, and several persons related to Well Thrive, sent payments to SemiLEDs towards the Promissory Note. Mr. Chang, on behalf of Well Thrive, wired $500,000 on August 16, 2016. (D.I. 71 (3/2 Tr.) at 40-41; JTX 5). The others submitted $600,000. (D.I. 71 (3/2 Tr.) at 42).

23. On August 30, 2016, SemiLEDs returned the $600,000 sent by those other than Well Thrive. (D.I. 71 (3/2 Tr.) at 42; D.I. 72 (3/3 Tr.) at 7-8). SemiLEDs did not return the $500,000 that Well Thrive had wired. (D.I. 71 (3/2 Tr.) at 42, 182-184; D.I. 72 (3/3 Tr.) at 7-8).[3]

24. The Purchase Agreement has a number of provisions relevant to this matter:

Section 1.3 defines the "Note Closing Date" as September 29, 2016. That section in full states:

> 1.3 Note Closing; Delivery. The date on which the closing of such purchase and sale of the Note occurs (the "Note Closing") is hereinafter referred to as the "Note Closing Date" and will be on or before September 29, 2016, the date that is ninety (90) days after the date of this Agreement. The Note Closing will be deemed to occur at the offices of Orrick, Herrington & Sutcliffe, LLP, 405 Howard Street, San Francisco, California 94105, when (A) this Agreement and the Note have been executed and delivered by the Company and the Investor, (B) each of the conditions to the Note Closing described in Section 5 of this Agreement has been satisfied or waived as specified therein and (C) full payment of the purchase price for the Note (the "Note Purchase Price") has been made by the Investor to the Company by wire

---

[3] There is a dispute regarding why the money was returned to the non-Well Thrive senders. The Court need not decide that dispute, however, in order to render a decision in the case.

transfer of immediately available funds against physical delivery by the Company of a duly executed Note in the name of the Investor as is set forth on the signature page hereto.

Section 5 provides the "Conditions to Closing." (JTX 1). Section 5.1 contains the "Conditions to Investor's Obligations at the Closings" and states:

> The Investor's obligations to effect each Closing, including without limitation its obligation to purchase the Shares or Note, as applicable, at each Closing, are conditioned upon the fulfillment (or waiver by the Investor in its sole and absolute discretion) of each of the following events as of each Closing Date:
>
> > 5.1.1 the representations and warranties of the Company set forth in this Agreement shall be true and correct in all material respects as of each Closing Date as if made on such date (except that to the extent that any such representation or warranty relates to a particular date, such representation or warranty shall be true and correct in all material respects as of that particular date);
> >
> > 5.1.2. the Company shall have delivered to the Investor a certificate, signed by the Chief Executive Officer of the Company or the Chief Financial Officer of the Company and dated as of each Closing Date, certifying that the conditions specified in Section 5.1.1. above have been fulfilled, it being understood that the Investor may rely on such certificate as though it were a representation and warranty of the Company made herein; and
> >
> > 5.1.3. the Company shall have delivered to the Investor a duly executed certificate representing the Shares, and the duly executed Note, as applicable, being purchased by the Investor at each Closing.

Section 5.2 contains the "Conditions to Company's Obligations at the Closings" and provides in pertinent part:

> > 5.2.2 the Investor shall have tendered to the Company the Share Purchase Price or the Note Purchase Price, as applicable, for the Securities being purchased by it at each Closing by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth on Exhibit B hereto.

Section 6.2.2. states:

> If (a) the Company has completed its obligations under Section 5.1.1 and 5.1.2 and has tendered the Securities as required in 5.1.3, and (b) the Investor fails to complete the obligations set forth in Section 5.2 or otherwise fails to consummate the transaction by December 31, 2016, then the Company shall keep all cash deposits made by the Investor as liquidated damages.

25.     Closing did not occur by or on September 29, 2016, *i.e.*, by the "Note Closing Date." (D.I. 71 (3/2 Tr.) at 170).

26.     SemiLEDs did not deliver to Well Thrive "a certificate, signed by the Chief Executive Officer of the Company or the Chief Financial Officer of the Company and dated as of each Closing Date," certifying that the conditions specified in Section 5.1.1 had been met.  Instead, Mr. Doan signed the certificate and "thinks" he sent it to his attorneys at Orrick Herrington before August 15, 2016.  (D.I. 72 (3/3/ Tr.) at 23).  The signed certificate was not offered into evidence.

27.     SemiLEDs did not deliver the duly executed Note to Well Thrive.  (D.I. 71 (3/2 Tr.) at 42, 158; D.I. 72 (3/3 Tr.) at 103-104).  Instead, Mr. Doan signed the Note (on an unspecified date (DTX 28)) and testified that he provided the Note to his attorneys at Orrick Herrington (D.I. 71 (3/2 Tr.) at 157; D.I. 72 (3/3 Tr.) at 21-22).

28.     The Note is undated and the Court has only the general testimony of Mr. Doan that he sent the Note to "Orrick" at some point before September 29, 2016.  There is no corroboration or confirmation that the Note was sent or received, no evidence of the date on which it was sent, no evidence as to how it was sent, and no evidence as to whom specifically it was sent (other than a law firm).  Thus, the Court cannot find that the Note was delivered to anyone by the Note Closing Date.

29.     Well Thrive did not pay the remaining amounts due for the Promissory Note by the Note Closing Date.  (*See* D.I. 71 (3/2 Tr.) at 56, 170).

30.     On December 16, 2016,[4] two and a half months after the missed closing, SemiLEDs sent a letter to Well Thrive demanding payment of the additional $1,115,000 million for the Note contemplated by the Purchase Agreement.  (JTX 10; D.I. 71 (3/2 Tr.) at 54, 173).

31.     On January 6, 2017, Well Thrive's lawyers responded, stating that Well Thrive would not lend additional funds to SemiLEDs and demanding return of the $500,000 deposit that Well Thrive had previously paid.  (JTX 11; D.I. 72 (3/3 Tr.) at 81).

32.     Well Thrive did not pay the additional amounts due.

33.     SemiLEDs did not return Well Thrive's $500,000 deposit towards the purchase of the Note.  (D.I. 71 (3/2 Tr.) at 41; D.I. 72 (3/3 Tr.) at 81).  SemiLEDs asserted that it was entitled to retain Well Thrive's $500,000 deposit as liquidated damages pursuant to the terms of Section 6.2.2. of the Purchase Agreement.  (JTX 10).

34.     On June 21, 2017, Well Thrive filed its Complaint.

**E.     The Purported Settlement**

35.     The engagement letter governing Mr. Prince's representation of Well Thrive in this litigation had separate signature blocks for Mr. Chiou, as an individual, and for Well Thrive.  (D.I. 72 (3/3 Tr.) at 118).  Mr. Chiou did not sign the engagement letter for Well Thrive.  (*Id*).  Mr. Chang signed the engagement letter for Well Thrive.  (D.I. 71 (3/2 Tr.) at 44; D.I. 72 (3/3 Tr.) at 118).  Mr. Chiou and Well Thrive were separate clients of Mr. Prince's firm.  (D.I. 72 (3/3 Tr.) at 147).

---

[4]     On the same day, SemiLEDs' Board of Directors held a meeting during which it decided not to proceed with the proposed merger with Aircom Pacific.  (D.I. 71 (3/2 Tr.) at 132; 175).  The parties dispute the relevance of the merger (or rather the failure of the merger to occur) to the current dispute regarding the Purchase Agreement.  The Court does not find the merger and the Purchase Agreement to be as unrelated as SemiLEDs suggests, but again, the Court need not decide that dispute to render its decision.

36.     Mr. Chang speaks limited English.  He relied on Mr. Shih to interpret information regarding this litigation to him.  (D.I. 71 (3/2 Tr.) at 45, 48).

37.     Mr. Shih asked Mr. Chiou to handle the case for Well Thrive, including communicating with counsel.  (D.I. 72 (3/3 Tr.) at 87).

38.     Mr. Prince was uncertain whether he had ever communicated with Mr. Shih.  (D.I. 72 (3/3 Tr.) at 126, 128, 148-49).  Mr. Prince never spoke to Mr. Chang.  (D.I. 72 (3/3 Tr.) at 126, 128, 148-49; *see also* D.I. 71 (3/2 Tr.) at 44-45).

39.     Mr. Prince sent bills for the litigation to Mr. Chiou and to Mr. Chang.  (D.I. 72 (3/3 Tr.) at 88).  Mr. Chiou did not pay the litigation bills.  (*Id.*)

40.     Mr. Shih was involved in payment of the legal fees for the litigation.  (D.I. 72 (3/3 Tr.) at 89-90).  After receiving the second round of bills, Mr. Shih became concerned about the costs of the lawsuit and began to complain to Mr. Chiou.  (D.I. 72 (3/3 Tr.) at 90).

41.     Mr. Shih eventually told Mr. Chiou that the case was a "waste of money" because the fees might exceed the amount recovered.  (D.I. 72 (3/3 Tr.) at 94-95).

42.     Mr. Shih asked Mr. Chiou to speak with SemiLEDs to see if the case could be settled.  (D.I. 71 (3/3 Tr.) at 108-109).[5]  Mr. Chiou then asked Mr. Lee about settlement but Mr. Lee informed him that SemiLEDs would not pay any money to settle.  (D.I. 72 (3/3 Tr.) at 109).

43.     Mr. Chiou reported this information to Mr. Shih and Mr. Shih told Mr. Chiou "to go settle it."  (D.I. 72 (3/3 Tr.) at 92).  Mr. Chiou contacted Mr. Prince and they decided to settle the case on terms that involved each party walking away and paying its own fees and costs to "stop the bleeding" of attorneys' fees.  (D.I. 72 (3/3 Tr.) at 92, 110).  Mr. Chiou discussed settlement on those terms with Mr. Shih and Mr. Shih "sighed" and said "go for it."  (D.I. 72 (3/3 Tr.) at 92-93).

---

[5]     Mr. Shih denies that he ever spoke to Mr. Chiou about settlement of the case.  (D.I. 71 (3/2 Tr.) at 111).  The Court finds that testimony to be not credible.

44.     Mr. Chiou then told Mr. Prince to settle the case on the terms they had discussed – *i.e.*, a walk-away.  (D.I. 72 (3/3 Tr.) at 92-93).  When he did so, Mr. Chiou believed that he had authority from Mr. Shih to agree to settle on those terms for Well Thrive.  (D.I .72 (3/3 Tr.) at 110-111).

45.     Neither Mr. Chiou nor Mr. Shih is employed by Well Thrive.  (D.I. 71 (3/2 Tr.) at 30).

46.     Neither Mr. Chiou nor Mr. Shih has authority to settle a lawsuit.  Mr. Chang is the only person authorized to settle a lawsuit.  (D.I. 71 (3/2 Tr.) at 46).

47.     There is no evidence that Mr. Chang authorized Mr. Shih, Mr. Chiou or Well Thrive's lawyers to settle this lawsuit.  Mr. Chang did not speak to Mr. Shih or Mr. Chiou about settling this lawsuit, and he did not authorize either of them to settle the lawsuit.  (D.I. 71 (3/2 Tr.) at 48-49).

48.     Mr. Prince did not speak to Mr. Chang about the settlement notwithstanding that Mr. Chang had signed the engagement letter with his firm for Well Thrive – not Mr. Chiou.

49.     On November 27, 2017, counsel for Well Thrive wrote an email to counsel for SemiLEDs, stating:  "Our ADR conference is coming up next week . . . Have you had the opportunity to speak with your client about settlement along the lines we discussed?"  (DTX 7).  This referenced a discussion between Mr. Prince and SemiLEDs counsel in which they had discussed, *inter alia*, the costs of the litigation.  (D.I. 72 (3/3 Tr.) at 124-125).

50.     Mr. Prince told SemiLEDs counsel that he "didn't have any authority from [his] clients for any specific number," but that he felt that he could "convince [his] client to settle for something far less than the amount demanded."  (D.I. 72 (3/3 Tr.) at 124).

51.     On November 29, 2017, counsel for Well Thrive emailed counsel for SemiLEDs, stating: "I understand from my client that the parties have reached some accommodation . . . I am

told that the parties have agreed to a dismissal with each side to bear its own costs. Can you confirm with your client?" (DTX 8, at 1; D.I. 72 (3/3 Tr.) at 125). The email also stated: "I have prepared a stipulation for dismissal. Let me know if the form is acceptable." (DTX 8). The proposed stipulation stated:

> IT IS HEREBY STIPULATED by and between Plaintiff Well Thrive Ltd. and Defendant SemiLEDs Corporation, through their undersigned counsel and subject to approval by the Court, as follows: The complaint on file in this action be dismissed, without prejudice, in its entirety pursuant to Federal Rule of Civil Procedure 41(a)(1), with each party to bear its own attorneys' fees and costs.

(DTX 8 at 2; D.I. 72 (3/3 Tr.) at 128-129).

52.     Mr. Prince could not represent that, when he prepared the stipulation and sent it to SemiLEDs counsel, he "believed that that is what the parties had agreed to." (D.I. 72 (3/3 Tr.) at 129).

53.     On November 30, 2017, counsel for SemiLEDs responded to the November 29 email, stating: "We have been in touch with our client. We are also unaware of any formal settlement agreement but we can prepare one, if that is agreeable to you. We confirm that the parties have agreed to bear their own costs and attorneys' fees but the stipulation for dismissal has to be with prejudice, not without prejudice. None of us want another case to be filed. Please revise the draft stipulation to reflect 'with prejudice.'"

54.     Later that day, Well Thrive's counsel responded: "I don't have a problem revising the stipulation, but if the suit is dismissed with prejudice, we do need a formal agreement with mutual releases. I'm happy to let you take a crack at the first draft." (DTX 9 at 1-2).

55.     SemiLEDs' counsel responded "OK. Please revise the stipulation and we will prepare a draft settlement agreement with mutual releases." (DTX 9 at 1; D.I. 72 (3/3 Tr.) at 129-131).

56.     On December 1, 2017, Delaware counsel for Well Thrive forwarded to counsel for both parties a draft letter to Magistrate Judge Thynge to inform her of the parties' settlement.  On the same day, counsel for SemiLEDs proposed a change in the draft letter to say that the parties have reached a settlement (deleting proposed language that said "in principle") and, further, that the parties are in the process of preparing a formal settlement agreement and a stipulation for dismissal and expect to complete the settlement within two weeks.  (D.I. 72 (3/3 Tr.) at 133-134).[6]

57.     On the same day, December 1, 2017, Delaware counsel for Well Thrive circulated a revised draft of the letter to Magistrate Judge Thynge and all counsel approved the letter. (DTX 13 at 1-2).

58.     On December 1, 2017, Delaware counsel for Well Thrive sent the letter to Magistrate Judge Thynge.  (D.I. 23-1, Ex. K).  The letter stated:

> I am local counsel to the Plaintiff in this matter.  I am pleased to report that the parties have reached a settlement of the case and are in the process of preparing a settlement agreement and stipulation of dismissal which they expect to complete in the next two weeks.  The parties believe that the teleconference scheduled before Your Honor on Tuesday December 5 to discuss ADR is not necessary.

59.     After receiving the letter, Magistrate Judge Thynge took the telephone conference to discuss ADR off the calendar.  (D.I. 18).

60.     On December 4, 2017, counsel for SemiLEDs forwarded a draft settlement agreement to counsel for Well Thrive.  (DTX 14).  The draft provided for a dismissal of the action with prejudice, with each party to bear its own costs and attorneys' fees, and mutual releases. (DTX 14 at 2-3).  In response, counsel for Well Thrive said he would try to respond by the next day.  (DTX 15).

---

[6]     In its proposed findings of fact, SemiLEDs cites to DTX 11 to support the discussions regarding the draft letter.  (D.I. 75, ¶ 80).  DTX 11, however, was not admitted into evidence.  Thus, the Court relies on the witness testimony at trial to make this finding.

61.     On December 19, 2017, counsel for Well Thrive sent an email to counsel for SemiLEDs with what he described as a "few minor revisions" to the draft settlement agreement. (DTX 16 at 1).  He noted that he had not been able to obtain final confirmation from his client about the settlement.  (*Id.*; D.I. 72 (3/3 Tr.) at 140).

62.     On the same day, counsel for SemiLEDs wrote to counsel for Well Thrive that he agreed with all of the suggested changes, except the proposed deletion of "with prejudice" in one place.  (DTX 17 at 1).  Counsel for the parties then exchanged follow-up emails and counsel for Well Thrive said "OK."  (DTX 17 at 1; D.I. 72 (3/3 Tr.) at 141-142).  Mr. Prince signed off on drafts of the settlement documents including dismissal of the action with prejudice and waivers of fees and costs to be sent to clients for signature.  (D.I. 72 (3/3 Tr.) at 139).

63.     Mr. Prince testified that, at that time, he also communicated that he needed to get client approval for the settlement.  (D.I. 72 (3/3 Tr.) at 142 ("Did you ever even communicate to [SemiLEDs' counsel] that you needed still after even saying okay to get client approval for the settlement? A. Yes. I believe I communicated that to you many times.")).

64.     On December 21, 2017, counsel for Well Thrive forwarded to SemiLEDs' counsel a proposed stipulation for dismissal of the action with prejudice.  (DTX 18 at 1; D.I. 72 (3/3 Tr.) at 142-143).  The proposed stipulation recited:  "IT IS HEREBY STIPULATED by and between Plaintiff Well Thrive Ltd. and Defendant SemiLEDs Corporation, through their respective counsel, that this action be dismissed with prejudice with each party to bear its own attorneys' fees and costs."  (DTX 18 at 2).

65.     On the same day, counsel for SemiLEDs forwarded comments on the proposed stipulation to counsel for Well Thrive.  (DTX 19 at 1-2).  On December 26, 2017, counsel for Well Thrive responded with: "The changes are fine with me."  (DTX 19 at 1).  On December 27, 2017, counsel for SemiLEDs wrote to counsel for Well Thrive:  "So we are all good. Our client has

signed [the settlement agreement].  Please obtain your client's signature and let's wrap this up this week."  (DTX 19 at 1).

66.     At the end of December 2017, Mr. Chiou left Aircom Pacific.  (*See* D.I. 71 (3/2 Tr.) at 65-67).  Soon after that, Mr. Chang learned for the first time that settlement discussions had occurred without his authorization.[7]  (D.I. 71 (3/2 Tr.) at 67-69).  He instructed Mr. Shih to put a halt to the discussions.  (D.I. 71 (3/2 Tr.) at 69).

67.     On February 26, 2018, Lesnick, Prince & Pappas and Delaware counsel for Well Thrive jointly moved to withdraw as counsel of record for Well Thrive.  (D.I. 19).  The motion and its supporting declarations cited a breakdown in communications, irreconcilable differences, a conflict of interest, and non-payment of fees as the reasons for the motion to withdraw.  (D.I. 19 at 2; D.I. 19-1 ¶ 2; D.I. 19-2 ¶ 2).  On March 26, 2018, this Court granted the motions to withdraw (D.I. 26).

68.     On March 13, 2018, SemiLEDs filed a motion to enforce the settlement agreement that it believed the parties had reached.  (D.I. 21).

69.     On March 27, 2018, Well Thrive, through new counsel, opposed the motion to enforce the settlement agreement and submitted a declaration from Mr. Chang attesting that he had not agreed to the settlement.  (D.I. 27; D.I. 27-1; DTX 1).

70.     The Court denied the motion, noting that there remained a question as to whether Well Thrive's former lawyers and Mr. Chiou had authority from Well Thrive to settle this case. (D.I. 38).  The Court allowed limited discovery on the issue.

---

[7]     SemiLEDs asserts that Mr. Chang's testimony is not credible and inconsistent with a sworn declaration submitted to the Court.  (*See* D.I. 75 ¶¶ 91-95; D.I. 76 at 14).  The Court, however, listened carefully to Mr. Chang's testimony and the cross-examination about purported inconsistencies.  The Court found Mr. Chang to be a credible witness.

71.     On December 10, 2019, SemiLEDs amended its Answer to assert two affirmative defenses:  (1) that "[t]he claims asserted in the Complaint are barred because the parties to this litigation entered into a valid and enforceable settlement" and (2) that the claims are barred by accord and satisfaction.  (D.I. 60 at 4).

## III.  LEGAL STANDARDS

### A.  Declaratory Judgment

Claims for declaratory relief are governed by the Federal Rules of Civil Procedure and the Declaratory Judgment Act.  *See* Fed. R. Civ. P. 57; 28 U.S.C. §§ 2201-2202; *see also Akzona Inc. v. E.I. du Pont de Nemours & Co.*, 662 F. Supp. 603, 615 (D. Del. 1987) (citing *Enka B.V. of Arnhem, Holland v. E.I. Du Pont de Nemours & Co.*, 519 F. Supp. 356, 360 (D. Del. 1982)).  "Under the Declaratory Judgment Act, this Court may declare the 'rights and other legal relations' of parties to a 'case of actual controversy within its jurisdiction.'"  *Enka*, 519 F. Supp. at 360 (quoting 28 U.S.C. § 2201); *see also Zimmerman v. HBO Affiliate Grp.*, 834 F.2d 1163, 1170 (3d Cir. 1987) ("The Declaratory Judgments Act provides that a court 'may' declare the rights and other legal relations of any interested party seeking such declaration . . . ." (citing 28 U.S.C. § 2201)).  The decision to grant or withhold a declaratory judgment is committed to the discretion of the district court.  *Zimmerman*, 834 F.2d at 1170.

Before a federal court may grant a declaratory judgment, there must be a live dispute between the parties.  *Id.* (citing *Cutaiar v. Marshall*, 590 F.2d 523 (3d Cir. 1979)).  "There must be a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant issuance of a declaratory judgment.  The fundamental test is whether the plaintiff seeks merely advice or whether a real question of conflicting legal interests is presented for judicial determination."  *Zimmerman*, 834 F.2d at 1170.

A declaratory judgment is appropriate where it will:  "(1) clarify and settle legal relations in issue and (2) terminate and afford greater relief from the uncertainty, insecurity, and controversy giving rise to present action."  *Delaware State Univ. Student Housing Found. v. Ambling Mgmt. Co.*, 556 F. Supp. 2d 367, 374 (D. Del. 2008) (quoting *Gruntal & Co., Inc. v. Steinberg*, 837 F. Supp. 85, 89 (D.N.J. 1993)).  "The real value of the judicial pronouncement . . . is in the settling of some dispute **which affects the behavior of the defendant towards the plaintiff**."  *Delaware State*, 556 F. Supp. 2d at 374 (emphasis in original); *see also Rhodes v. Stewart*, 488 U.S. 1, 4 (1988).  A declaration interpreting contractual relationships when the relief sought could affect present behavior of the contracting parties is an appropriate claim for declaratory relief.  *See Delaware State*, 556 F. Supp. 2d at 374 (citing *Burger King Corp. v. Family Dining, Inc.*, 426 F. Supp. 485 (E.D. Pa. 1977)).

### B.       Unjust Enrichment

"Unjust enrichment is defined as the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."  *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999) (citation and internal quotation marks omitted).  The elements of unjust enrichment under Delaware law are:  "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."  *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).  In evaluating a party's claim for an equitable remedy based on unjust enrichment, however, "courts inquire at the threshold as to whether a contract already governs the parties' relationship."  *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 58 (Del. Ch. 2012) (citing *MetCap Sec. LLC v. Pearl Senior Care, Inc.*, No. 2129-VCN, 2007 WL 1498989 (Del. Ch. May 16, 2007)).  "It is a well-settled principle of Delaware law that a party cannot recover under a theory of unjust enrichment if a contract governs the relationship between

the contesting parties that gives rise to the unjust enrichment claim." *Vichi*, , 62 A.3d at 58 (citing

*Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 942 (Del. 1979) ("Because the contract is the

measure of plaintiffs' right, there can be no recovery under an unjust enrichment theory

independent of it.")).

### C.      Enforcement of Settlement Agreement

A district court has jurisdiction to enforce a settlement agreement entered into by litigants

in a case pending before it.  *See Leonard v. University of Delaware*, 204 F. Supp. 2d 784, 786

(D. Del. 2002).  "A party seeking to enforce [a] settlement agreement has the burden of proving

the existence of [a] contract by a preponderance of the evidence." *Schwartz v. Chase*, No. 4274-

VCP, 2010 WL 2601608, at *4 (Del. Ch. June 29, 2010) (internal citations omitted); *see also*

*Williams v. Chancellor Care Center of Delmar*, No. 06C-05-146 MMJ, 2009 WL 1101620, at *3

(Del. Super. Ct. Apr. 22, 2009).  "Under Delaware law, contract formation is a question of fact."

*Sheets v. Quality Assured, Inc.*, No. N14C-03-010 VLM, 2014 WL 4941983, at *2 (Del. Super.

Ct. Sept. 30, 2014) (citations omitted).  Three elements are necessary to prove the existence of an

enforceable contract:  (1) the intent of the parties to be bound by it; (2) sufficiently definite terms;

and (3) consideration  *Id.*

Generally, "[w]here an attorney of record accepts a settlement offer on behalf of his client,

either orally or in writing, a binding contract is created.  The attorney is presumed to have the

lawful authority to make such an agreement." *Williams*, 2009 WL 1101620, at *3.  An attorney,

however, must have actual authority from his client to bind that client to any settlement. *Nagyiski*

*v. Smick*, No. U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, 2009 WL 5511159, at *2 (Del. Ct. Com. Pl. Dec. 9, 2009).  "Where

an attorney consents to the settlement of his client's case without the actual consent of the client,

the settlement will not be binding on the client." *Joyner v. News Journal*, No. 95A-12-004, 1996

WL 659005, at *4 (Del. Super. Aug. 27, 1996) (citing *Aiken v. Nat'l Fire Safety Counsellors*,

127 A.2d 473 (Del. Ch. 1956)); *see also Montgomery v. Achenbach*, No. 04C-11-048WLW, 2007 WL 1784080, at *2 (Del. Super. Ct. May 17, 2007). "It is the client's burden to rebut a presumption [that its attorney had] lawful authority." *Williams*, 2009 WL 1101620, at *3.

## IV   **DISCUSSION**

### A.   **Declaratory Judgment**

There is no dispute that there is a substantial and immediate controversy between the parties. Well Thrive paid SemiLEDs a $500,000 deposit toward the purchase of the Note pursuant to the Purchase Agreement. Well Thrive asked for the money back after the Note Closing did not occur. SemiLEDs refused to return the money.

The Purchase Agreement is at the heart of the parties' dispute. Interpretation of a contract is ultimately a question of law. "When interpreting a contract, the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). The "combination of the parties' words and the plain meaning of those words where no special meaning is intended," however, constrains a court in its interpretation of that contract. *Id.* "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent." *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

Section 6.2.2 of the Purchase Agreement is the provision on which SemiLEDs relies to retain the $500,000 deposit. Section 6.2.2 states:

> *If (a) the Company has completed its obligations under Section 5.1.1 and 5.1.2 and has tendered the Securities* as required in 5.1.3, *and* (b) the Investor fails to complete the obligations set forth in Section 5.2 or otherwise fails to consummate the transaction by December 31, 2016, *then* the Company shall keep all cash deposits made by the Investor as liquidated damages.

(JTX 1 at § 6.2.2) (emphasis added). Both parties agree that § 6.2.2 is not ambiguous and should be interpreted according to its plain meaning.

Well Thrive argues that the plain meaning of § 6.2.2 is that SemiLEDs may not keep, as liquidated damages, any money paid unless and until SemiLEDs has delivered the Securities (*i.e.* "[t]he Shares, the Note and the shares of Common Stock of the Company issuable upon conversion of the Note" (JTX 1 at § A)) to Well Thrive (JTX 1 at § 5.1.3). SemiLEDs argues that, when read in conjunction with other clauses of the contract, § 6.2.2 imposes "concurrent conditions" on the parties that allow SemiLEDs to retain Well Thrive's money.

The Court agrees with Well Thrive. The plain meaning of the words in § 6.2.2 is that two conditions must be met before SemiLEDs may keep the $500,000 deposit. First, SemiLEDs must have completed its obligations under §§ 5.1.1 and 5.1.2 and tendered the Securities as required in § 5.1.3 and, second, Well Thrive must have failed to complete its obligations set forth in § 5.2. Only "then" shall SemiLEDs keep a deposit as liquidated damages. Here, however, only one of those conditions occurred, *i.e.*, Well Thrive did not pay the balance of the money due. The other condition required SemiLEDs to deliver to Well Thrive a duly executed certificate representing the shares and the duly executed Note. That did not occur.

The Court disagrees that the conditions set forth in § 6.2.2 are "concurrent." Sections 1.1 and 1.3 of the Purchase Agreement set forth the procedures by which SemiLEDs' sale of shares and the Note, respectively, would close. Both clauses require "full payment . . . by wire transfer" by Well Thrive "against physical delivery" of the share certificates and Note. Indeed, §§ 1.1. and 1.3 contemplate a process where (a) payments would be made "by wire transfer" "on or before" specified dates, (b) other conditions of the Purchase Agreement would be "satisfied or waived," (c) "physical delivery" of securities would be made, after which point (d) the closings will "be deemed to [have] occurred" at Orrick. The sale of shares was "deemed" closed when both the money and shares were delivered to the respective parties.

Similarly, SemiLEDs argument that delivery of the Note to its lawyers at Orrick (rather than Well Thrive) constituted performance is unavailing.  Initially, there is scant evidence – beyond uncorroborated general testimony – that such a delivery occurred at all, let alone by the Note Closing Date.  (*See* Court's Finding Nos. 26-28).  Moreover, SemiLEDs argument runs counter to both the plain language of the Purchase Agreement and the parties' conduct in practice. The Purchase Agreement specifies delivery to the "Investor" (a/k/a Well Thrive), not to a lawyer. Indeed, this is what happened in connection with the sale of the SemiLEDs' shares.  The evidence was that SemiLEDs delivered shares to Well Thrive.  (D.I 72 (3/3 Tr.) at 52-53).  There was apparently not a simultaneous exchange at Orrick.

Accordingly, the Court will enter declaratory judgment that SemiLEDs was not authorized under § 6.2.2 of the Purchase Agreement to retain Well Thrive's $500,000 deposit because a condition precedent in § 6.2.2 was not satisfied.

### B.      Unjust Enrichment

As noted above, "a party cannot recover under a theory of unjust enrichment if a contract governs the relationship between the contesting parties that gives rise to the unjust enrichment claim." *Vichi*, 62 A.3d 26, 58 (Del. Ch. 2012).  Here, the parties agree that the Purchase Agreement is the document governing their relationship and this dispute.  Well Thrive paid $500,000 under the Purchase Agreement towards the purchase of the Note.  SemiLEDs asserts that it can keep that money based on the Purchase Agreement.  The Purchase Agreement governs the relationship at issue here and, therefore, Well Thrive's unjust enrichment claim must fail.

### C.      Enforcement of Settlement Agreement[8]

---

[8]      SemiLLEDs asserted two affirmative defenses – enforcement of a settlement agreement and accord and satisfaction.  The two defenses are based on the same facts and SemiLEDs addressed the two defenses together in its papers.   The Court addresses them together as well.

The Court acknowledges that Mr. Prince appears to have agreed to a settlement with SemiLEDs. Although he testified that he informed SemiLEDs "many times" that he needed approval of his client, including after he signed off on the settlement documents, he agreed that it had been communicated to SemiLEDs that there was a settlement. (D.I. 72 (3/3 Tr.) at 140-141). Indeed, the correspondence between Mr. Prince and SemiLEDs counsel supports that. (*See* DTX 7-9, DTX 13-19). Thus, it is Well Thrive's burden to rebut a presumption that Mr. Prince had lawful authority to settle the case. *Williams*, 2009 WL 1101620, at *3.

Well Thrive has met its burden. Mr. Prince did not have actual consent of his client. Mr. Chang signed the engagement letter for Well Thrive, not Mr. Chiou. Mr. Chang was the person to whom bills were sent for work done for Well Thrive. Mr. Chang is the only person with authority to settle this case.[9] Yet Mr. Prince never discussed the settlement with Mr. Chang and there is no suggestion that Mr. Prince ever asked Mr. Chiou if Mr. Chang had agreed to the settlement for Well Thrive. The Court finds credible Mr. Chang's testimony that he was unaware of settlement discussions until after Mr. Chiou left Aircom. Indeed, there is no evidence that Mr. Chang knew about or gave authorization to engage in settlement discussions, let alone for the settlement. Thus, the Court finds that there was no binding contract formed and, as such, the Court will not enforce the settlement agreement against Well Thrive.

## V.    **CONCLUSION**

For the foregoing reasons, the Court finds that: (1) Well Thrive has proven that it is entitled to a declaratory judgment that § 6.2.2 of the Purchase Agreement does not allow SemiLEDs to retain the $500,000 Well Thrive paid towards the purchase of the Note; (2) Well Thrive has failed

---

[9]    The Court is troubled that Mr. Shih apparently overstepped his authority in telling Mr. Chiou to settle the case and then denied having done so when called to answer to Mr. Chang. That, however, does not change the fact that Mr. Chang, the person needed in order to settle the case, did not authorize Mr. Prince to do so.

to meet its burden to prove its claim for unjust enrichment; and (3) Well Thrive has rebutted the presumption that the settlement agreement entered into by its counsel was authorized, and the Court will not enforce the settlement agreement.  An appropriate order will follow.